IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 3, 2025

**IN RE KA'MYIAH M.[1] ET AL.**

**Appeal from the Juvenile Court for Wilson County**
**No. 2023-JT-4     Barry Tatum, Judge**

_____

**No. M2024-01421-COA-R3-PT**
_____

Father appeals the termination of his parental rights as to four biological children and one child for whom he was the legal parent. The trial court found multiple grounds for termination and that termination of Father's parental rights was in the children's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court for Wilson County Affirmed as Modified**

JEFFREY USMAN, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and VALERIE L. SMITH, J., joined.

Jacquelyn M. Scott, Lebanon, Tennessee, for the appellant, Kelvin S.

Jonathan Skrmetti, Attorney General and Reporter; and Clifton W. Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Jacob Fordham, Goodlettsville, Tennessee, Guardian ad Litem.

**OPINION**

I.

This appeal concerns the termination of Kelvin S.'s (Father) parental rights to five children he shares with Denisha M. (Mother): Ka'Myiah M., Deborah M., Kelmauri M., Amariah S., and Kaizlynn M. (collectively "the children"). Father and Mother, who never married, have been in an intermittent, long-term relationship over many years. Despite

_____

[1] It is the policy of this Court to protect the privacy of children in parental termination cases by avoiding the use of full names.

this, Father is listed as a parent on the birth certificate for Amariah S. but is not listed on the birth certificates of Ka'Myiah M., Deborah M., Kelmauri M., or Kaizlynn M. Kaizlynn was born during these proceedings. Mother also had her parental rights terminated; however, she has not appealed. Accordingly, only Father's parental rights are before this court on appeal.

An event on June 19, 2022, served as a catalyst leading to the termination of Father's parental rights. By that time, Father already had a lengthy criminal history, including convictions for robbery and evading arrest in 2003, vandalism and drug possession in 2013, theft in 2014, and possession of a firearm by a convicted felon in 2019. He has been incarcerated for much of the children's lives. Additionally, the three eldest children had previously been removed from Mother's and Father's care by DCS and placed in the legal custody of their maternal grandmother. Father testified that during that period, he regularly spent time with all five children and provided financial assistance to the grandmother.

While on parole in 2022, Father was driving with Mother, two of their shared children, and a third child when a Wilson County Sheriff's Deputy attempted to initiate a traffic stop after observing Father run a stop sign. Father fled at high speed, with the deputy testifying that the vehicle reached speeds "in excess of 70 miles an hour" in a 35-mph residential zone. Father drove into oncoming traffic, causing the deputy to terminate the pursuit for public safety. The chase ended when Father's vehicle blew a tire and crashed into two parked cars. Father, Mother, and the children fled the scene on foot into nearby woods. Father later testified that he fled because he was driving on a revoked license and because he knew Mother had an outstanding warrant.

The following day, DCS received a referral alleging drug exposure, environmental neglect, and lack of supervision. Two days later, DCS conducted a home visit. After conducting this home visit, DCS removed the four then-born children and placed them with their maternal grandmother under an order/agreement prohibiting their contact with Father and Mother.

The arrangement with the grandmother was short-lived. Less than two months after placing the children with her, DCS learned that the grandmother allowed them unauthorized contact with the parents. Additionally, hair follicle drug screens were performed on the four oldest children, and all tested positive for cocaine and its metabolites. The children were removed to DCS custody and placed in foster care, and DCS filed a supplemental petition alleging the four children were victims of severe abuse. Several months later, the youngest child was born while Mother was incarcerated. She was immediately placed in DCS custody and has been in the same foster home as her siblings since she was three days old.

After the children were removed from Mother's and Father's custody, Father, who had been "on the run," was arrested and later indicted on multiple charges, including

possession of cocaine, reckless endangerment, evading arrest, and driving on a revoked license. Mother was also arrested. The documents related to Father's arrest indicate that he was charged with possession of more than 0.5 grams of cocaine, four counts of reckless endangerment with a deadly weapon, evading arrest, leaving the scene of an accident, and driving on a revoked license. He pled guilty to two counts of reckless endangerment with a deadly weapon and to evading arrest. The remaining charges were dismissed. His sentence was for eight years with a four year prison sentence and four additional years on probation. He has remained incarcerated since.

Father's incarceration hampered his ability to comply with the two permanency plans DCS had developed to assist him in reuniting with the children. The permanency plans required Father to, upon his release from jail, obtain and maintain legal employment and secure safe, child-appropriate housing. He was also required to satisfy all his current legal charges without gaining new ones, complete individual therapy and domestic violence education, and participate in regular, sober therapeutic visitations to build a bond with his children. Additionally, he was required to complete "specialized assessment[s] and follow recommendations." Father had completed some of the required assessments prior to his incarceration. After he was transferred to the custody of the Department of Correction, multiple facility transfers hindered his ability to maintain contact with DCS. DCS met with Father in person several times while he was at the Wilson County Jail to give him updates and show him pictures of the children while he was incarcerated.

Reflecting on the condition of children at their arrival, the foster mother testified that when the children first arrived in her care, the older girls had mildew in their hair. The foster mother also stated the children seemed to know too much about sex. She also testified that they fought frequently, had been exposed to adult horror movies, and had significant educational and developmental needs. The older children required therapeutic and academic intervention to address their needs. Ka'Myiah struggled in kindergarten and required a summer program to pass; she is in play therapy. Deborah has difficulty with focus and attention and is also in play therapy. Kelmauri has been diagnosed with autism, is delayed in several areas, and receives occupational and physical therapy. DCS noted that the foster family is caring for the children, all their needs are met, and services are being provided to them. DCS noted that the children are now thriving in their placement and refer to their foster parents as "mom" and "dad."

On December 11, 2023, DCS filed a petition to terminate parental rights against Father and Mother. On April 5, 2024, addressing the Dependency and Neglect Petition which had been filed in June 2022, the trial court held an adjudication hearing in which it found Father committed severe child abuse by fleeing from law enforcement with the children in the vehicle. Father did not appeal this decision. On April 24, 2024, DCS amended its termination petition to add that father was found to have committed severe child abuse in the Dependency and Neglect proceedings.

The trial on the petition to terminate Father's parental rights was held on May 24, 2024. Father was only the legal parent of Amariah S.; he had not taken action to establish legal paternity for the other four children. He claimed to have done DNA tests for Ka'Myiah, Deborah, and Kelmauri, but did not present those at trial, and DCS had no record of them. He also claimed to have seen all the children daily and assisted their grandmother when not incarcerated.

Father has made a variety of statements describing his care for the children. For example, Father has stated that he was "the primary breadwinner." However, he also testified that he did not pay any child support to the children's grandmother and agreed that he "never paid child support" when questioned by the Guardian ad Litem, explaining, "When I'm paying the bills, why should I?" He admitted to using marijuana laced with cocaine while the children were in his care, though he claimed not to have used it directly in front of them. He also knew that Mother used drugs but took no action to protect the children. At trial, he acknowledged his failure to care for the children and testified that he would need about six months after his release before being able to assume custody.

The trial court issued its decision terminating Mother's and Father's parental rights on August 21, 2024. The juvenile court found clear and convincing evidence to terminate Father's parental rights as to all five children on the grounds of abandonment by an incarcerated parent by wanton disregard, severe child abuse, failure to manifest an ability and willingness to assume custody, and, for the four children for whom he was not the legal parent, the putative father grounds of failure to manifest an ability and willingness to assume custody as a putative father, risk of substantial harm from placing the child in the custody of a putative father, and failure to legitimate as a putative father.

Having found statutory grounds for the termination of Father's parental rights, the trial court proceeded to consider the statutory best interest factors to determine whether Father's parental rights should be terminated. Of the 20 factors, the trial court concluded 12 factors supported termination, and the remaining factors were not applicable. Having considered all the factors, the trial court concluded by clear and convincing evidence that terminating both Mother's and Father's parental rights was in the children's best interest. Accordingly, the trial court terminated their parental rights.

As noted above, Father appeals the termination of his parental rights. Mother does not. On appeal, Father contends the trial court erred both as to finding grounds for termination and its conclusion that termination of his parental rights is in the best interest of the children.

II.

Parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This

fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. 36-1-113(c)(1)-(2) (effective July 1, 2023, to June 30, 2024)[2]; *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d).

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights.

*In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## III.

The trial court found DCS presented clear and convincing evidence that established six grounds for terminating Father's parental rights. The trial court found DCS established abandonment by an incarcerated parent by wanton disregard, severe child abuse, and

---

[2] *See In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

failure to manifest an ability and willingness to assume custody as to all the children.[3] For the four children for whom he was not the legal parent, the trial court also found the putative father termination grounds of failure to manifest an ability and willingness to assume custody as a putative father, risk of substantial harm from placing the child in the custody of a putative father, and failure to legitimate as a putative father. We address each in turn.

## A. Abandonment by an Incarcerated Parent by Wanton Disregard

The trial court found that DCS presented clear and convincing evidence that Father abandoned the children through his incarceration and through conduct that displayed a wanton disregard for their welfare. *See* Tenn. Code Ann. § 36-1-113(g)(1); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(iv)*(c)* (effective July 1, 2023, to June 30, 2024). In addressing this ground for termination, the trial court made the following findings:

> [Father] was in jail part or all of the four months just before this petition was filed, serving an 8 year sentence for reckless endangerment with a deadly weapon and evading arrest, and possession of a firearm by convicted felon.
>
> The Court finds that the minor child[ren] were the following years of age when the Department's termination petition was filed. Ka'Myiah M., 6; Deborah M., 5; Kelmauri M., 4; Amariah S., 1; and Kaizlynn M., less than 1.
>
> [Father] has [engaged] in conduct that exhibits a wanton disregard for the children's welfare by engaging in criminal conduct. [Father] has a long criminal history and has spent large parts of the children's lives incarcerated. At the time of the attempted traffic stop which led to the Dependency and Neglect Petition being filed, [Father] was on probation. Nonetheless, he chose to flee from police at a high rate of speed, ultimately resulting in his arrest, incarceration and conviction.
>
> [Father]'s history with the criminal justice system and continued behavior that has resulted in his extended incarceration, demonstrate a pattern of illegal behavior.
>
> DCS has proven, by clear and convincing evidence, the ground(s) of abandonment by incarcerated parent by wanton disregard against [Father].

---

[3] Father does not assert that DCS may not seek termination of his parental rights under Tennessee Code Annotated section 36-1-113(g)(1), (g)(4), and (g)(14). This court has recognized that statutory changes have rendered these grounds applicable to putative fathers along with the (g)(9)(A) putative father grounds. *See*, *e.g.*, *In re Katelyn R.*, No. M2023-00354-COA-R3-PT, 2024 WL 1299102, at *9-10 (Tenn. Ct. App. Mar. 27, 2024).

Under Tennessee Code Annotated section 36-1-113(g)(1), "termination of parental or guardianship rights may be based upon . . . [a]bandonment . . . as defined in § 36-1-102 . . . ." Among the actions that constitute abandonment, the General Assembly has included within the definition the following:

> A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action if the child is four (4) years of age or more or three (3) consecutive months immediately preceding the filing of the action if the child is less than four (4) years of age and has: . . .
>
> *(c)* With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child. . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

Father was incarcerated during the four months prior to DCS filing the petition for termination, and he does not argue otherwise. Instead, in opposing the trial court's finding, he argues that the only "specific" incident relied on was the traffic stop incident in June 2022. Father asserts that aside from that incident, "there was no evidence presented that [he] was acting in a manner inappropriate for a parent." He adds that the bulk of his criminal conduct occurred prior to the birth of his children.

This court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). Father's previous criminal conduct resulted in his incarceration for 18 out of 23 years before trial, and he is currently serving an eight-year sentence with four years of incarceration followed by four years on probation. While Father asserts that the record shows only one criminal action after the birth of his children, the high-speed evasion of law enforcement, we note the evidence also established that Father used marijuana laced with cocaine.

This court has found wanton disregard to exist where a parent with a history of prior criminal conduct engages in serious criminal conduct that results in reincarceration. In *In re Malachi M.*, this court determined that a mother who had been released on parole only to engage in continuing drug abuse which resulted in her further incarceration had

abandoned her child through wanton disregard. *In re Malachi M.*, No. E2020-01114-COA-R3-PT, 2021 WL 1140272, at *5 (Tenn. Ct. App. Mar. 25, 2021). Similarly, in *In re Chyna L.M.D.*, while a father was out on probation, he engaged in further criminal conduct that violated the terms of his probation and resulted in his being returned to prison instead of being allowed to continue to remain in the community. *In re Chyna L.M.D.*, No. E2012-00661-COA-R3-PT, 2012 WL 3776699, at *5 (Tenn. Ct. App. Aug. 31, 2012). This court concluded that such behavior constituted abandonment by wanton disregard. *Id*.

The circumstances of this case are more severe than in the aforementioned cases. In addition to the type of drug offenses in which the mother in *In re Malachi M.* and the father in *In re Chyna L.M.D.* engaged — and Father concedes in the present case that he used marijuana laced with cocaine after the birth of four of the five children — Father also engaged in criminal conduct that created a direct and immediate danger of serious bodily injury to three children who were in the vehicle at the time he engaged in a high-speed evasion of law enforcement, including Ka'Myiah and Kelmauri. Father was engaging in criminal conduct which precipitated his decision to evade a law enforcement officer who was trying to effectuate a stop. Instead of stopping his vehicle, Father engaged in a high-speed drive with children in the vehicle that ended in a crash and the vehicle's inhabitants fleeing by foot into the woods.

In understanding whether wanton disregard has been established, this court has repeatedly observed that "[a]cts amounting to wanton disregard typically 'reflect a "me first" attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child.'" *In re Melvin M.*, No. M2021-01319-COA-R3-PT, 2022 WL 17250274, at *4 (Tenn. Ct. App. Nov. 28, 2022) (quoting *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015)); *see also*, *e.g.*, *In re Tinsley L.*, No. E2022-00965-COA-R3-PT, 2023 WL 6057476, at *2 (Tenn. Ct. App. Sept. 18, 2023). In reaching a determination as to wanton disregard, courts "may consider all evidence relevant to determining 'whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.'" *In re Layton W.*, No. M2021-00084-COA-R3-PT, 2021 WL 4440539, at *4 (Tenn. Ct. App. Sept. 28, 2021) (quoting *In re Audrey S.*, 182 S.W.3d at 866).

Father's criminal conduct meant that, instead of continuing to live in the community with his children, he was returned to prison for years. When engaging in this conduct, he created a significant risk of danger to children, including Ka'Myiah and Kelmauri, who were in the vehicle. His drug use and evasion of law enforcement with children in the vehicle, while on release from prison, reflect the type of "me first attitude" that is at the heart of abandonment by wanton disregard. Father did precisely that: he abandoned the children by engaging in continuing criminal conduct that was especially dangerous to three children, including two of his own.

- 8 -

However, we draw a distinction with regard to this ground for termination as to one of the children — the youngest, Kaizlynn M. For abandonment to occur through wanton disregard, Father must have had "knowledge of the existence of the born or unborn child." Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c). *See also*, *e.g.*, *In re Anthony R.*, 2015 WL 3611244, at *3 ("Logically, a person cannot disregard or display indifference about someone whom he does not know exists . . . . [T]he wanton disregard language . . . must be construed to require that the father has knowledge of the child at the time his actions constituting wanton disregard are taken.").

Father engaged in the evasion of law enforcement through his high-speed escape on June 19, 2022. Kaizlynn was born on February 12, 2023. We do not know how many weeks Mother was along in her pregnancy with Kaizlynn when the high-speed chase took place. Kaizlynn certainly may have been conceived prior to Father's criminal action in evading law enforcement, and Mother may have been pregnant during this dangerous evasion. The record does not, however, provide clear and convincing evidence to support that Father was aware that Mother, who would have certainly been extremely early in her pregnancy, was pregnant.

In the absence of evidence as to Father's awareness of Mother's pregnancy, this ground is not supported by clear and convincing evidence with regard to the termination of Father's parental rights as to Kaizlynn. *See*, *e.g.*, *In re Elijah H.*, No. M2020-01548-COA-R3-PT, 2021 WL 4593844, at *8 (Tenn. Ct. App. Oct. 6, 2021) ("In the absence of establishing at what point Father became aware of Mother's pregnancy with the Child, we cannot conclude that Father exhibited wanton disregard for the Child at the time of his alleged offenses and arrest."); *In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *12 (Tenn. Ct. App. June 6, 2017) (reversing the trial court's finding that the father abandoned the child by wanton disregard because the record was "silent with respect to when Father was first aware of Mother's pregnancy"). This court confronted a comparable circumstance in *In re Leann K.* in which the father's continuing criminal conduct that resulted in reincarceration was determined to be abandonment by wanton disregard as to the three older children, but this court concluded termination upon this ground as to the two youngest children was error. *See In re Leann K.*, No. M2021-00053-COA-R3-PT, 2021 WL 3485915, at *5 (Tenn. Ct. App. Aug. 9, 2021).

Based upon the above and from our review of the record, the trial court did not err in concluding that DCS presented clear and convincing evidence that Father's behavior demonstrated a wanton disregard as to Ka'Myiah M., Deborah M., Kelmauri M., and Amariah S., but the trial court did err in finding wanton disregard as to Kaizlynn M. Therefore, the trial court did not err in finding that Father abandoned through wanton disregard Ka'Myiah M., Deborah M., Kelmauri M., and Amariah S. The trial court did, however, err in finding abandonment by wanton disregard as to Kaizlynn M.

B.  Severe Child Abuse

The trial court also found by clear and convincing evidence that Father committed severe child abuse.  If a parent "has been found to have committed severe child abuse, as defined in [Tennessee Code Annotated] § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against *any* child," there are grounds to terminate parental rights.  Tenn. Code Ann. § 36-1-113(g)(4) (emphasis added).  Tennessee Code Annotated § 37-1-102 defines "severe child abuse" as, *inter alia*, the "knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-102(27)(A)(i) (effective  May 5, 2023 to June 30, 2024).

In concluding that Father had committed severe child abuse, the trial court made the following findings:

[Father] committed severe child abuse against the children . . . .

[Father] also committed severe child abuse as defined by statute. Specifically, [Father failed to] comply with a traffic stop and led law enforcement on a high speed police chase.  [Father] was not located by law enforcement. However, he was found sometime later and ultimately charged with 4 counts of Reckless Endangerment with the use of a deadly weapon, leaving the scene of an accident, driving on a suspended license, and possession of a controlled substance that was located in the vehicle by law enforcement.

[Father] admitted he was the driver of the vehicle.  He admitted [Mother] was a passenger, as well as another unknown adult male and 3 children, including [Ka'Myiah] and Kelmauri.  Zahnaya M. — a child of mother but not of [Father] who was also in the vehicle.

[Father] admitted [to] running from the police but denied getting the vehicle to the rate of speed indicated by Deputy Burt — 70 mph (in a 35 MPH residential zone).

[Father] did admit that while trying to flee from law enforcement, a tire on the vehicle blew out, causing him to hit more than one parked vehicle in the nearby subdivision before ultimately coming to rest.

[Father] admitted he, [Mother], and the children all fled the vehicle on foot and into the wooded area near where the car came to rest.

DCS presented a certified Judgement from [Father]'s corresponding criminal case wherein he plead guilty to two counts of Felony Reckless Endangerment with the use of a deadly weapon. He accepted a 4 year prison sentence as a result of the plea.[4]

In addition, the trial court noted that it previously, in the context of a dependency and neglect proceeding, "adjudicated the children dependent and neglected and the victims of severe child abuse" by Father.

Father did not appeal that dependency and neglect determination. Quite properly, Father notes that he "must concede that the issue of severe abuse is *res judicata* and cannot be further attacked here." Nevertheless, "the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. Accordingly, while Father appropriately concedes this ground, pursuant to the charge to this court under *In re Carrington H.*, we, nevertheless, must assess this ground for termination. *See, e.g.*, *In re Danielle V.*, No. W2023-01023-COA-R3-PT, 2024 WL 342518, at *8 (Tenn. Ct. App. Jan. 30, 2024); *In re Lijah D.*, No. E2019-02297-COA-R3-PT, 2020 WL 5888143, at *5 (Tenn. Ct. App. Oct. 5, 2020).

The dependency and neglect proceedings resulted in a determination that severe abuse was perpetrated by Father. This court has repeatedly addressed the res judicata impact of such determinations. *See, e.g., In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *5-6 (Tenn. Ct. App. Jan. 21, 2025). As this Court has previously explained, res judicata is a doctrine that treats "an existing final judgment rendered upon the merits . . . by a court of competent jurisdiction, [as] conclusive of rights, questions and facts in issue as to the parties . . . in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990)). In the context of severe child abuse, res judicata permits a trial court to treat a prior finding of severe child abuse in a dependency and neglect proceeding as conclusive evidence establishing the ground of severe child abuse during a subsequent termination of parental rights hearing. *Id.* All of the parties in this case agree that they were the same parties included in the Wilson County Juvenile Court's dependency and neglect adjudication, the issue of severe child abuse was plainly litigated during that proceeding, and Father did not appeal that finding of severe child abuse. *See id.* (concluding res judicata applied where

---

[4] As noted above, Father entered a plea to two counts of reckless endangerment with a deadly weapon and to one count of evading arrest, and he was sentenced to four years in confinement for evading arrest and two years of supervised probation for each reckless endangerment, all to be served consecutively for a total of eight years, four years in prison followed by four years of probation. The trial court refers to the sentence both as an eight-year sentence and as a four-year prison sentence based on the full length of the sentence (eight-year sentence) and time ordered to be spent in confinement (four years).

all parties were identical and "the issue of whether Mother committed severe child abuse was fully litigated"). Accordingly, the trial court's finding of the termination ground of severe child abuse by clear and convincing evidence was not in error.

### C. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court also stated in its order that clear and convincing evidence supported the ground for termination that Mother and Father failed to manifest an ability and willingness to assume custody of the children. *See* Tenn. Code Ann. § 36-1-113(g)(14). In support of its conclusion, the trial court made the following findings:

> [Mother and Father] have failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the children.
>
> . . .
>
> [Father] is incarcerated and serving an 8 year prison sentence.[5] He has some credit toward the sentence but still has time to serve.
>
> [Father] has spent the majority of the children's lives in jail or prison. Despite being out on probation in 2022, [Father] chose poorly, ran from law enforcement, and endangered himself and his children.
>
> [Father] has admitted also [to] using illicit drugs during the time his children have been alive. He denies a serious substance abuse issue, but does admit he uses recreationally.
>
> Placing the children in [Mother] or [Father]'s legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children.

The trial court also found that Father "has demonstrated an inability to make a lasting change."

To satisfy this ground, two prongs must be proven by clear and convincing evidence: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and (2) placing the child in the parent's legal and physical custody would pose a risk of

---

[5] As noted above, Father was sentenced to four years in prison to be followed by four years of probation.

- 12 -

substantial harm to the physical or psychological welfare of the child. Tenn. Code Ann. § 36-1-113(g)(14); *In re Neveah M*., 614 S.W.3d 659, 674 (Tenn. 2020).

The Tennessee Supreme Court has indicated that the statute places a "conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d at 677. Failure of the parent to manifest either ability or willingness will satisfy the first prong. *Id*. "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome . . . obstacles" preventing the parent from assuming custody. *In re Serenity W*., No. E2018-00460-COAR3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody. *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019). To the contrary, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). This court instead considers a parent's efforts to overcome any obstacles standing in the way of assuming custody or financial responsibility. *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (citing *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A failure to make efforts to overcome such obstacles "can undercut a claim of willingness." *Id*. As for the second prong, a substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility" to be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018).

Father argues the oral findings which the trial court made at trial on this ground were insufficient. Assuming for purposes of argument that the trial court's oral statements regarding this ground for termination were inadequate, it is, nevertheless, "well settled that trial courts speak through their written orders." *Elvis Presley Enters., Inc. v. City of Memphis*, 620 S.W.3d 318, 324 n.6 (Tenn. 2021) (citing *Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015)).

Father argues, however, that the court's written findings regarding this ground are still insufficient. He does concede, and the record supports, "that his incarceration has prevented him from having the ability to take physical custody of the children." Father views the basis of the trial court's decision, however, as being a mystery, and assumes that upon release he would be willing and able to assume custody and care properly for the children.

We do not view the basis of the trial court's ruling as being mysterious. The trial court plainly observed that Father is an individual who has spent 18 out of his last 23 years in jail or prison. Furthermore, upon release, given an opportunity to be present for his children, Father instead engaged again in criminal conduct that resulted in his reincarceration. The criminal conduct in which Father engaged in by fleeing from police with three children in the vehicle endangered not only himself but also the children. In other words, Father's criminal conduct posed a direct threat of serious harm to at least two of his children and a third child who was present in the vehicle. The trial court also expressed concern about Father's continuing recreational drug use. Father's contention that his behavior was unproblematic because he stepped away from the children's immediate presence when using drugs did not alleviate the trial court's concern regarding his drug use. The trial court also found that Father "has demonstrated an inability to make a lasting change."

This court has repeatedly found such circumstances to demonstrate a lack of ability or willingness to assume custody and to pose a substantial risk of harm. *See, e.g.*, *In re Grace F.*, No. M2023-00344-COA-R3-PT, 2023 WL 8915746, at *12 (Tenn. Ct. App. Dec. 27, 2023) (finding the parents' continued drug use would pose a risk of substantial harm to the welfare of the children); *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL 710841, at *9 (Tenn. Ct. App. Feb. 24, 2021) (finding, *inter alia*, a parent's continued drug use "would pose 'a risk of substantial harm to [the child's] physical or psychological welfare.'"); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *8 (Tenn. Ct. App. Apr. 23, 2020) (citation omitted) ("Considering the foregoing, the evidence is more than sufficient to prove the first ground of failure to manifest a willingness and ability to assume custody or financial responsibility . . . . Mother has been incarcerated since March 22, 2017 — about half of Jeremiah's life and nearly all of Joseph's, evidencing a clear inability to assume custody and financial responsibility, despite any amount of willingness. As such, we conclude that DCS presented sufficient evidence to establish that Mother was not able and willing to assume physical or legal custody of the children."); *In re Eli S.*, No. M2019-00974-COA-R3-PT, 2020 WL 1814895, at *8 (Tenn. Ct. App. Apr. 9, 2020) ("[W]e agree with the trial court that Mother's history of drug abuse and both parents' repeated criminal conduct and resulting incarceration demonstrates that each lacks the ability to parent Eli."); *In re O.M.*, No. E2018-01463-COA-R3-PT, 2019 WL 1872511, at *4 (Tenn. Ct. App. Apr. 26, 2019) (finding the ground to be established where the father had an extensive criminal history including current incarceration and involvement with drugs); *In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *11 (Tenn. Ct. App. Jan. 29, 2018) (finding parents who were incarcerated and who engaged in repeated criminal conduct necessitating their re-incarceration to lack the ability to assume custody and to pose a risk of substantial harm).

We conclude that the trial court did not err in finding that DCS proved by clear and convincing evidence that Father failed to manifest an ability and willingness to assume custody of his children under Tennessee Code Annotated section 36-1-113(g)(14).

- 14 -

D. Putative Father Grounds

As noted above, Father was listed as a parent on the birth certificate for Amariah but was not so listed for Ka'Myiah, Deborah, Kelmauri, or Kaizlynn. Thus, the trial court analyzed grounds for termination under the putative father portion of the statute as to Ka'Myiah, Deborah, Kelmauri, and Kaizlynn. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A).

A "putative father" is

> a biological or alleged biological father of a child who, at the time of the filing of the petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, meets at least one (1) of the criteria set out in § 36-1-117(c), has not been excluded by DNA testing as described in § 24-7-112 establishing that he is not the child's biological father or that another man is the child's biological father, and is not a legal parent.

Tenn. Code Ann. § 36-1-102(44). A biological father is also a putative father when he "has entered a permanency plan under title 37, chapter 2, part 4, or under similar provisions of any other state or territory in which the biological father acknowledges paternity of the child." Tenn. Code Ann. § 36-1-117(c)(5) (effective July 1, 2023, to June 30, 2024).

The trial court found "pursuant to T.C.A. § 36-1-102(44) and T.C.A. § 36-1-117(c),[6] when the State's Petition was filed, the [Father] was a 'putative father' of the minor children" for whom he was not a legal parent. Father is not, and never has been, married to Mother. Furthermore, Father provided no evidence that he satisfied any of the statutory requirements to become the legal parent of any of the children besides Amariah.[7] Father entered into permanency plans with DCS for each child. Accordingly, the trial court did not err in finding Father to be a putative father. The trial court's findings as to the putative father grounds apply to Ka'Myiah, Deborah, Kelmauri, and Kaizlynn but not to Amariah.

A putative father's parental rights may be terminated, among other bases, when:

---

[6] In 2024, the General Assembly amended Tennessee Code Annotated section 36-1-117 as follows: "Tennessee Code Annotated, Section 36-1-117, is amended by deleting subsection (c)." 2024 Tenn. Pub. Acts, ch. 996, § 15, eff. July 1, 2024. However, as noted above, "This court applies the versions of the parental termination statutes in effect on the date the petition was filed." *In re J.S.*, 2023 WL 139424, at *6.

[7] Father testified that he took DNA tests that proved he was the father of Ka'Myiah, Deborah, and Kelmauri; however, he did not present those tests in court. Additionally, DCS has no record of ever receiving them.

. . .

(iii) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(iv) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(v) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(2).

Tenn. Code Ann. § 36-1-113(g)(9)(A)(iii)–(v).

The trial court found each of these grounds to have been proven by clear and convincing evidence. In support thereof, the trial court made the following findings:

The Court finds that, pursuant to Tennessee Code Annotated §§ 36-1-102(29), 36-1-102(44), 36-1-113(g)(9), and 36-1-117(c), at the time that the State's termination petition was filed, [Father] was not a "legal parent" of the minor children, Ka'Myiah, Deborah, Kelmauri, and Kaizlynn, as defined in T.C.A. § 36-1-102(29). Rather, pursuant to T.C.A. § 36-1-102(44) and T.C.A. § 36-1-117(c), when the State's Petition was filed, [Father] was a "putative father" of the minor children.

[Father] did not legitimate the children.

[Father] failed to manifest a willingness and ability to take custody of the children. He has remained incarcerated since shortly after the filing of the Petition. [Father] still[] has more time to serve. Prior to the most recent criminal case and corresponding period of incarceration, [Father] had spent the majority of the children's lives in jail/prison. He has demonstrated an inability to make a lasting change.

[Father] failed to file a petition for paternity after being put on notice by the mother regarding the children respectively. [Father and Mother] have long been involved in a romantic relationship. Although [Father] has held himself out to be the father of the children, he and [Mother] were never married and no action has been tak[en] by [Father] to establish paternity.

- 16 -

Placing custody of the children in [Father]'s custody would pose a risk of substantial harm to the children's physical or psychological welfare. Furthermore, it is physically impossible at this time as [Father] continues to serve time for TDOC. The children deserve permanency.

DCS has proven, by clear and convincing evidence, the grounds for termination contained in T.C.A. §§ 36-1-113(g)(9) and 36-1-117(c) against [Father].

We address below grounds (iii) and (iv) together and ground (v) separately.

1. Failure to Manifest a Willingness and Ability to Assume Custody & Risk of Substantial Harm to the Physical or Psychological Welfare of the Child

As noted above, the trial court found that Father failed to manifest an ability and willingness to assume custody of the children, and the trial court found that placing the children in Father's custody would pose a risk of substantial harm to the physical or psychological welfare of the children. This court has noted the similarity between these (g)(9) grounds for termination and the (g)(14) ground for termination based upon failure to manifest an ability and willingness to assume custody. *See*, *e.g.*, *In re Kaitlyn D.*, No. M2023-00658-COA-R3-PT, 2024 WL 1049483, at *13-14 (Tenn. Ct. App. Mar. 11, 2024); *In re J.S.*, 2023 WL 139424, at *9; *see also In re Neveah M.*, 614 S.W.3d at 677 (describing the "has failed to manifest an ability and willingness to assume legal and physical custody of the child" of (g)(9) as "nearly identical" to the first prong of (g)(14) language); *In re Ahleigha C.*, No. E2020-01683-COA-R3-PT, 2021 WL 3401021, at *8 (Tenn. Ct. App. Aug. 4, 2021) (describing the "[p]lacing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child" as "nearly identical to the second prong of section (g)(14)"). For the reasons discussed above in addressing the (g)(14) ground for termination, we conclude that the trial court similarly did not err in finding that these putative father grounds for termination were proven by clear and convincing evidence.

2. Failure to File a Petition to Establish Paternity of the Children Within Thirty Days After Notice of Alleged Paternity

The trial court also found a ground for termination under Tennessee Code Annotated section 36-1-113(g)(9)(A)(v), which provides for termination if a putative father "has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(2)."

Regarding this ground, Father raises three core arguments in opposition to the trial court's finding. One, Father argues that the trial court's oral ruling was not sufficiently

detailed. Two, Father asserts that he was known to be the father of the children and that he was not aware of any obligation to file a petition to establish paternity. Three, he argues that the statutory measure is unfair to unmarried fathers of limited means.

Regarding argument one, Father contends the trial court's oral findings were insufficient as to this ground. As noted above, even assuming for purposes of argument that the trial court oral statements regarding this ground for termination were inadequate, it is, nevertheless, "well settled that trial courts speak through their written orders." *Elvis Presley Enters., Inc.* 620 S.W.3d at 324 n.6 (Tenn. 2021) (citing *Williams*, 465 S.W.3d at 119 (Tenn. 2015)).

As for argument two, Father concedes in his brief that The Criteria and Procedures for Termination of Parental Rights DCS provided to him "mention that failure to establish paternity could be a ground to terminate rights," but he adds that it does so "without offering any in-depth explanation or source for additional information." This court has, nevertheless, found such information from DCS to be a basis for concluding a parent has been informed in a variety of contexts related to parental termination. *See*, *e.g.*, *In re Samone D.*, No. W2021-01225-COA-R3-PT, 2023 WL 1962016, at *10 (Tenn. Ct. App. Feb. 13, 2023) (rejecting the father's contention of ignorance in connection with the impact of a violation of the permanency plan and noting that "Father signed the Criteria and Procedures for Termination of Parental Rights, which provided him with notice that his failure to comply with the permanency plan could result in the termination of his parental rights."). Furthermore, it is a well-worn maxim in Tennessee law, and beyond, "that ignorance of the law constitutes no valid ground of justification or excuse" for violation thereof. *McGuire v. State*, 26 Tenn. 54, 55 (1846). Furthermore, the putative father grounds "do not include a willfulness requirement." *In re Whisper B.*, No. M2023-01313-COA-R3-PT, 2024 WL 4851265, at *7 (Tenn. Ct. App. Nov. 21, 2024) (quoting *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *9 (Tenn. Ct. App. Apr. 25, 2005)). More specifically, this court has rejected a variety of arguments akin to Father's in the present case. In *In re Samone D.*, the putative father accepted the children as his children and did not feel it was necessary to establish paternity, but the trial court found that this termination ground was, nevertheless, properly established. *In re Samone D.*, 2023 WL 1962016, at *14. In *In re Ken'bria B.*, the putative father noted that he was incarcerated and did not know how to establish paternity, but this court rejected his excuse, concluding "incarceration is not a legitimate excuse for all manner of parental neglect of responsibilities. An incarcerated parent, although undeniably facing hardships in jail, may still do some things including making at least some attempt to legitimate his child." *In re Ken'bria B.*, No. W2017-01441-COA-R3-PT, 2018 WL 287175, at *10 (Tenn. Ct. App. Jan. 4, 2018). In *In re Nicholai L.*, the father argued as an excuse that he did not think that he could establish paternity and had received no communication from DCS. *In re Nicholai L.*, No. M2023-01796-COA-R3-PT, 2024 WL 4579538, at *6 (Tenn. Ct. App. Oct. 25, 2024). The *In re Nicholai L* Court rejected the putative father's argument and in doing so noted that "this ground for termination does not 'require that DCS exert reasonable efforts

- 18 -

to assist Father in establishing himself as a legal parent.'" *Id*. (quoting *In re E.C.*, 2017 WL 2438574, at \*8).

We turn to Father's third argument, where, as noted above, he contends this termination ground is unfair to unmarried fathers of limited means. We note that Father has not developed or asserted a facial or as-applied constitutional challenge; rather, Father's argument is one of policy. He argues that the General Assembly's approach is unfair to unmarried fathers of limited means. However, it is clear that Tennessee courts are not to "substitute our policy judgment for that of the Legislature." *Chuck's Package Store v. City of Morristown*, 545 S.W.3d 398, 402 (Tenn. 2018). Father's argument invites us to do precisely that, presenting an invitation that we decline to accept as it puts us beyond the bounds of our proper role.

IV.

Having concluded that at least one statutory ground for termination of parental rights has been shown against Father by clear and convincing evidence, our focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1).

In addressing these statutory factors, the trial court made the following findings:

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(A) is applicable in this matter. Thus, the Court finds it is in the best interest of the minor children for termination to be granted as to [Mother and Father], in that termination of parental rights will have a positive impact on the children's critical need for stability and continuity of placement throughout the children's minority. Thus, the Court finds that this factor weighs in favor of terminating [Mother's and Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(B) is applicable in this matter. Thus, the Court finds that it is in the children's best interest for termination to be granted as to [Mother and Father], in that a change of caregivers and physical environment from the children's current placement would likely have a negative effect on the children's emotional, psychological and/or medical condition. [Mother's] situation is currently unknown as she has refused to participate in the case. However, [M]other's longstanding drug addiction has not been adequately addressed. Furthermore, [Mother] has not seen the children in quite some time. The children are situated well in the foster home and have developed relationships in that setting that are healthy and loving. [Father] is unable to care for the children. He remains in prison where he continues to serve the balance of his 8 year sentence. Thus, the Court finds that this factor weighs in favor of terminating the Respondents' parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(C) is applicable in this matter. Thus, the Court finds that it is in the children's best interest for termination to be granted as to [Mother and Father], in that the parents have not demonstrated continuity and stability in meeting the children's basic material, educational, housing and safety needs. Thus, the Court finds that this factor weighs in favor of terminating [Mother's and Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(D) is applicable in this matter. Thus, the Court finds . . . that it is in the children's best interest for termination to be granted as to [Mother and Father], in that the parents and children do not have a secure and healthy parental attachment. Further, there is not a reasonable expectation that the parents will be able to create such an attachment. The older children do have a relationship with [Mother and Father] but have not seen either parent in a long time. [Father] is unable to visit with the children due to his incarceration and [Mother] has simply abandoned the children. The younger children have had limited contact with either [Mother or Father]. Thus, the Court finds that this factor weighs in favor of terminating [Mother's and Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(E) is applicable in this matter. Thus, the Court finds that it is in the children's best interest for termination to be granted as to [Mother and Father], in that the parents have not maintained regular visitation or other contact with the children. Thus, the Court finds that this factor weighs in favor of terminating the [Mother's and Father's] parental rights.

The Court finds that the best interest factor 113(i)(1)(F) is not applicable in this matter and does not weigh in favor of, or against, termination.

The Court finds that the best interest factor 113(i)(1)(G) is not applicable in this matter and does not weigh in favor of, or against, termination.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(H) is applicable in this matter. Thus, the Court finds that . . . it is in the children's best interest for termination to be granted as to [Mother and Father], because the children have created a healthy parental attachment with another person or persons in the absence of the parents. The children have created a bond with the resource parents and the extended family thereof. Thus, the Court finds that this factor weighs in favor of terminating [Mother's and Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(I) is not applicable in this matter and does not weigh in favor of, or against, termination.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(J) is applicable in this matter. Thus, the Court finds that [it is] in the children's best interest for termination to be granted as to the [Mother and Father], because there is criminal activity in the parents' home. Both [Mother and Father] have a history of criminal conduct, including while this case has been pending. Thus, the Court finds that this factor weighs in favor of terminating the [Mother's and Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(J) is applicable in this matter. Thus, the Court finds that [it is] in the children's best interest for termination to be granted as to the [Mother and Father], because the parents use alcohol, controlled substances and/or controlled substance analogues which render the parents unable to consistently care for the children in a safe and stable manner. Thus, the Court

finds that this factor weighs in favor of terminating the [Mother's and Father's] parental rights.[8]

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(K) is applicable in this matter. Thus, the Court finds that it is in the children's best interest for termination to be granted as to [Mother and Father], because the parents have not taken advantage of available programs, services, or community resources to assist them in making a lasting adjustment of circumstances, conduct and/or conditions. Thus, the Court finds that this factor weighs in favor of terminating [Mother's and Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(L) is applicable in this matter. Thus, the Court finds that it is in the children's best interest for termination to be granted as to [Mother and Father], because the Department has made reasonable efforts to assist the parents in making a lasting adjustment in their conduct or circumstances, but, despite these efforts, the parents have made no change in their conduct or lifestyle. Thus, the Court finds that this factor weighs in favor of terminating [Mother's and Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(M) is applicable in this matter. Thus, the Court finds that it is in the children's best interest for termination to be granted as to [Mother and Father] because the parents have not demonstrated a sense of urgency in establishing paternity of the children [or addressing] conditions that made an award of custody unsafe and not in the children's best interest. Thus, the Court finds that this factor weighs in favor of terminating [Mother's and Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(N) is not applicable in this matter and does not weigh in favor of, or against, termination.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(O) is applicable in this matter. Thus, the Court finds that it is in the children's best interest for termination to be granted as to the [Mother and Father], because the parents have never provided safe and stable care for the children. Thus, the Court finds that this factor weighs in favor of terminating [Mother's and Father's] parental rights.

---

[8] The trial court addressed factor (J) twice in its decision.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(P) is not applicable in this matter and does not weigh in favor of, or against, termination.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(Q) is applicable in this matter. Thus, the Court finds that it is in the children's best interest for termination to be granted as to [Mother and Father] because the parents have failed to demonstrate the ability and commitment to creating and maintaining a home that meets the children's basic and specific needs and in which the children can thrive. Thus, the Court finds that this factor weighs in favor of terminating [Mother's and Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(R) is not applicable in this matter and does not weigh in favor of, or against, termination.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(S) is not applicable in this matter and does not weigh in favor of, or against, termination.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(T) is not applicable in this matter and does not weigh in favor of, or against, termination.

Ultimately, the trial court concluded that DCS, by clear and convincing evidence, proved that it is in the children's best interest to terminate Father's parental rights.

In addition to disagreeing with the trial court's ultimate conclusion, Father raises multiple challenges to the trial court's findings. We understand Father's arguments as standing in opposition to the trial court's findings in six respects. One, Father argues that he was helpful to the maternal grandmother when she had custody of the children, including cooking for them and helping with bills. Father advances this argument in relation to the trial court's findings as to factor (C), which provides for consideration of "[w]hether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs . . . ." The trial court was unpersuaded that Father demonstrated continuity and stability in meeting those needs. Given Father's extensive criminal history, continuing engagement in criminal conduct resulting in reincarceration, and past and present deficiencies in meeting the children's needs, we find no error in the trial court's conclusion as to factor (C).

Two, Father argues that he can rebuild a close bond with the children. He advances this argument in relation to factor (D), which addresses "[w]hether the parent and child

- 25 -

have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment." The trial court concluded that Father does "not have a secure and healthy parental attachment" with the children and that "there is not a reasonable expectation that" he "will be able to create such an attachment." From our review of the record, we find no error in the trial court's conclusion as to this factor. The trial court concluded that Father had not made a lasting change. Father's extensive criminal history, his recreational drug use, his continuing engagement in criminal conduct that resulted in reincarceration, and his failure to take advantage of an opportunity to be in the community and present in the lives of his children support the trial court's determination that there is no reasonable expectation that Father can create a secure and healthy parental attachment.

Three, Father argues that he is a changed and improved person. The trial court concluded that he had made no lasting change. From our review of the record, we cannot conclude that the trial court erred in this finding.

Four, Father argues that he should not be faulted for failure to act with a sense of urgency in establishing parentage of the children. The trial court disagreed. The trial court instead concluded that Father did not act with a sense of urgency in establishing parentage or addressing the underlying circumstances that led to removal. From our review of the record, we cannot conclude the trial court erred in these findings.

Five, Father makes interconnected arguments that he maintained as much of a relationship as he could with the children given the limitations resulting from his incarceration, that he took advantage of the limited programs available to him in prison, and that DCS failed to make reasonable efforts to work with him while he was in prison. It is apparent from the record that DCS did make some effort to work with Father while he was incarcerated but ran into complications. The trial court's findings and the record are thin on the extent of DCS's efforts. Father's arguments raise reasonable contentions that at least undermine the weight that should be placed upon DCS's efforts. Assuming arguendo that this was error, any error in this regard is, nevertheless, insufficient to change the soundness of the overall conclusion of the trial court regarding the best interests of the children.

Six, Father argues that he loves the children. We do not doubt that Father loves Ka'Myiah, Deborah, Kelmauri, Amariah, and Kaizlynn or even that maintaining the parent-child relationship with the children may be in Father's best interest. The General Assembly, however, has charged trial courts in parental termination cases with assessing the best interest of the child — the children's best interest, not Father's best interest. Tenn. Code Ann. § 36-1-113(i)(1); *see also*, *e.g.*, *In re Krisley W.*, No. E2022-00312-COA-R3-PT, 2023 WL 2249891, at *12 (Tenn. Ct. App. Feb. 28, 2023). This court is then charged with reviewing that determination. As noted by the trial court, Ka'Myiah, Deborah, Kelmauri, Amariah, and Kaizlynn do not have a secure and healthy parental attachment to

Father. Tenn. Code Ann. § 36-1-113(i)(1)(D) (providing for considering "[w]hether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment."). The children, however, have developed a healthy parental attachment with their foster parents, whom they call "mom" and "dad" and who wish to adopt them. Tenn. Code Ann. § 36-1-113(i)(1)(H) (establishing as a factor in assessing best interest of the child "[w]hether the child has created a healthy parental attachment with another person or persons in the absence of the parent."). With their foster parents, in a pre-adoptive home, the children have made significant strides in terms of their education, and the foster parents have facilitated the identification and treatment of their special needs, including various developmental delays and neurological conditions. Tenn. Code Ann. § 36-1-113(i)(1)(C) (stating as a factor "[w]hether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs."). These needs were not being met by Father or Mother. *Id*. While, as noted above, we do not doubt that Father loves Ka'Myiah, Deborah, Kelmauri, Amariah, and Kaizlynn, the trial court did not err in concluding that the children's bonds in the present case support termination rather than maintaining Father's parental rights.

In considering whether to terminate parental rights, the determination of a child's best interest "may not be reduced to a simple tallying of the factors for and against termination." *See In re Chayson D.*, 2023 WL 3451538, at *15. Rather, a court must determine, after completing a holistic assessment of the record, whether terminating a particular parent's rights would be in a particular child's best interest. *Id.* This court has repeatedly indicated that "[o]ften, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest." *In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *12 (Tenn. Ct. App. Apr. 14, 2020).[9]

In the present case, while there are individual factors as to which the trial court's analysis could be questioned, the correctness of the trial court's ultimate assessment and the thrust of its analysis is well-reasoned and plainly supported by the record. The trial court engaged in a thoughtful assessment of the circumstances of the present case in light of the statutory factors delineated by the Tennessee General Assembly. In this case, the children have made significant strides with their foster parents. In this pre-adoptive home, the children call their foster parents "mom" and "dad." The children have stability and security that they did not previously enjoy. The foster parents are attentive to their special needs, having obtained diagnoses and appropriate therapy. The foster parents are

---

[9] *See also*, *e.g.*, *In re Krisley W.*, 2023 WL 2249891, at *11; *In re Charles B.*, No. W2020-01718-COA-R3-PT, 2021 WL 5292087, at *11 (Tenn. Ct. App. Nov. 15, 2021); *In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *14 (Tenn. Ct. App. Nov. 10, 2021); *In re Christopher L.*, No. M2020-01449-COA-R3-PT, 2021 WL 4145150, at *9 (Tenn. Ct. App. Sept. 13, 2021*); In re Miley D.*, No. M2020-01416-COA-R3-PT, 2021 WL 2948776, at *6 (Tenn. Ct. App. July 14, 2021); *In re Cortez P.*, No. E2020-00219-COA-R3-PT, 2020 WL 5874873, at *12 (Tenn. Ct. App. Oct. 2, 2020).

constantly working to meet all of the various needs, and they are doing so while Mother and Father have failed to meet the children's needs. Though the children have significant developmental delays and therapeutic needs, the foster family can and does care for their needs while also providing a stable, pre-adoptive home where the children have bonded with the foster parents. Meanwhile, Father has spent the vast majority of the past quarter-century in prison or jail in connection with various criminal offenses. Released and presented with an opportunity to be part of his children's lives, Father instead engaged in criminal conduct that created a direct and immediate risk of serious harm to three children, including two who are the subject of this petition. Instead of being able to be a regular part of his children's lives, Father committed acts that resulted in his reincarceration. While Father insists that he has changed, the trial court did not believe him, concluding that Father has made no lasting change. Father also engaged in recreational drug abuse, using marijuana laced with cocaine. Father's leaving the children's immediate presence to use drugs understandably did not alleviate the trial court's concern about his continuing drug use. A return to Father's custody threatens to remove the children from the stable environment in which they are progressing and instead places them in a circumstance with substantial risk as to their physical and psychological welfare.

Ultimately, the trial court's conclusion that it is in the children's best interest to terminate Father's parental rights is supported by clear and convincing evidence. We find no error in the trial court's conclusion that termination is in the best interest of Ka'Myiah M., Deborah M., Kelmauri M., Amariah S., and Kaizlynn M.

V.

For the aforementioned reasons, we affirm as modified the judgment of the Juvenile Court for Wilson County. We affirm the trial court's termination of the parental rights of Kelvin S. as to Ka'Myiah M., Deborah M., Kelmauri M., Amariah S., and Kaizlynn M. Costs of this appeal are taxed to the appellant, Kelvin S., for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE